UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  09-cv-02292-WYD

RUDY SALAZAR,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

---

**ORDER**

---

      THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's claim for disability insurance benefits.  For the reasons stated below, this case is reversed and remanded for an immediate award of benefits.

I.     <u>INTRODUCTION AND BACKGROUND</u>

      Plaintiff was born in November 1956.  (Transcript ["Tr."] 44).  He obtained a high school education (general equivalency diploma, or GED) and worked in the relevant past as an airport baggage handler, warehouse worker or laborer, janitor, and kitchen helper.  (*Id.* 552.)  Plaintiff alleged that he became disabled on April 3, 2001, when he was 44 years old, because of back and neck problems (two herniated discs and one fused disc) that prevented him from performing physical labor.  (*Id.* 54).

      In 2002, Plaintiff filed an application for disability insurance benefits for which he was insured through December 31, 2006.  (Tr. 44-46.)  His application was denied.  Plaintiff requested a hearing before the ALJ, which was held in July 2004.  (*Id.* 402-41.)

ALJ Paul Keohane issued a decision in November 2004, finding that Plaintiff was not disabled. (*Id.* 15-22.) The Appeals Council declined Plaintiff's request for review.

Plaintiff sought judicial review in this Court and filed a second application. In March 2006, I issued an Order finding numerous errors with the ALJ's decision and remanding the case to the Commissioner. (Tr. 375-94.) The Appeals Council remanded the case for further administrative proceedings and consolidated the case with Plaintiff's second application. (*Id.* 398-99.)

In December 2006, ALJ Keohane held a supplemental hearing. (Tr. 526-65.) He then issued a decision on April 9, 2007, finding that Plaintiff was disabled within the meaning of the Act as of November 28, 2006, his 50th birthday (and one month before his insured status expired), but not before. (*Id.* 345J-345T.)

Specifically, the ALJ found at step one that Plaintiff had not worked since his alleged onset of disability date. (Tr. 345L, Finding 2.) At step two, the ALJ found that Plaintiff had severe impairments of "degenerative disc disease of the cervical spine, status postdiscectomy, and degenerative disc disease of the lumbar spine." (*Id.*, Finding 3.) At step three, he found that Plaintiff's impairments or combination of impairments did not meet or medically equal the requirements of a presumptively disabling listed impairment. (*Id.*, 345M, Finding 4.)

The ALJ then turned to an assessment of Plaintiff's residual functional capacity. ["RFC"]. He found that Plaintiff had the RFC to perform the following range of sedentary exertional work: "lifting and carrying less than ten pounds frequently and up to ten pounds occasionally; while sitting, or stand/walking, for up to six hours each in a regular

eight hour work day, with the ability to change positions at will; while avoiding all climbing or crawling activities; only occasionally balancing or stooping; and while reaching, fingering, and engaging in fine or gross manipulative activities occasionally. (Tr. 345M, Finding 5.)

At step four, the ALJ found that Plaintiff's RFC precluded him from performing his past relevant work.  (Tr. 345R, Finding 6.)  At step five, he found based on Plaintiff's vocational factors prior to November 28, 2006, the date Plaintiff's age category changed from a younger individual age 45-49, that Plaintiff could perform sedentary jobs existing in significant numbers in the national economy.  (*Id.* 345R, Finding 10.)  Based on Plaintiff's vocational factors on and after November 28, 2006, when Plaintiff was 50 years old and thus "closely approaching advanced age," the ALJ found that there were not a significant numbers of jobs in the national economy that Plaintiff could perform. (*Id.* 345S, Finding 11.)  Thus, the ALJ concluded that Plaintiff was disabled within the meaning of the Act as of November 28,2006, but not before.  (*Id.* 345S, Finding 12.)

The Appeals Council declined to exercise jurisdiction (Tr. 345A-345H), which was the final agency decision.  Plaintiff timely requested judicial review.  This Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

II.    ANALYSIS

A.    Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Hamilton v. Sec. of Health and*

*Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

B.  Whether the ALJ's Decision is Supported by Substantial Evidence

1.  Whether the ALJ Erred In Failing to Properly Weigh the Treating Physician's Opinions and in Not Including All of Plaintiff's Impairments

The first issue I address is whether the ALJ failed to properly weigh the treating physicians' opinions. The treating physicians were Drs. Richman, Chan and Sung. As discussed below, it is unclear exactly what weight the ALJ gave their opinions and findings, as well as the opinions of other medical providers.

I note that an ALJ is "required to give controlling weight to a treating physician's opinion about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and any physical or mental restrictions, if 'it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.'" *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir.

1995) (quotation omitted).  "A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it."  *Goatcher v. United States Dep't of Health and Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1994).  The ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion that a claimant is disabled."  *Id.*

The ALJ only referenced two opinions of treating physicians in his decision. (Tr. 345p.)  He did not discuss or analyze as to either opinion whether it should be given controlling weight.  He also completely ignored numerous other findings and opinions by treating physicians regarding Plaintiff's impairments.  This is discussed in more detail below.  The ALJ's failure to consider whether the treating physicians' findings and opinions were entitled to controlling weight generally requires a remand of the case for a proper analysis of this issue.  *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (citing SSR 96-2p, 1996 WL 374188, at *2) (quotations omitted).

Further, the ALJ's findings regarding the treating physicians' opinions that he considered are unclear as to the actual weight given these opinions.  This is also error. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (the ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight that was given to a medical opinion).

For example, the ALJ first referenced the functional capacity examination performed by treating physician Dr. Chan in 2002.  (Tr. 345P.)  Dr. Chan concluded that Plaintiff should not lift more than 15 pounds, should not lift anything overhead, had reduced grip strength, should avoid extension of the cervical spine, and could perform

work in a sedentary position.  (*Id.* 345P, 135-36.)  The ALJ stated that while Dr. Chan's

"conclusion that the claimant is capable of a range of sedentary work activity is

consistent with the medical evidence available at that time, the undersigned finds that

the claimant would have even greater physical limitations than as assessed by

Dr. Chan, subsequent to his cervical fusion and his lumbar injury."  (*Id.* 345P.)  This

does not, however, state what weight the ALJ actually gave to this assessment.

     While the ALJ's comments imply that he accepted Dr. Chan's assessment but

believed that even greater restrictions applied, the ALJ inexplicably did not include in the

RFC Dr. Chan's finding that Plaintiff should avoid extension of the cervical spine and

that Plaintiff had lifting restrictions and reduced grip strength.  Further, he ignored the

diagnosed impairment of a significant C8 radiculopathy.  (Tr. 136.)  This is error, as an

ALJ is not entitled to pick through an uncontradicted medical opinion, selecting some of

the restrictions or impairments without others, unless the ALJ adequately explains the

basis for this decision.  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007); *see also*

*Wiederholt v. Barnhart*, No. 03-3251, 2005 WL 290082, *5 (10th Cir. Feb. 8, 2005)

("[b]ecause the ALJ omitted, without explanation, impairments that he found to exist...,

the resulting hypothetical question was flawed").

     The ALJ also noted the December 2003 functional assessment of Plaintiff

completed by Dr. Richman.  (Tr. 345P.)   Dr. Richman opined that Plaintiff was at

maximum medical improvement and could return to work with the following permanent

restrictions:  lift no more than 10 pounds, carry and/or repetitively lift no more than five

pounds; push and pull no more than 20 pounds; and pinch and grip on a "minimal"

basis.  (*Id.* 205).

The ALJ stated that he gave "significant weight to Dr. Richman's opinion that the

claimant would be capable of a range of activities consistent with sedentary work, which

generally involved lifting and carrying no more than ten pounds."  (Tr. 345P.)  However,

the ALJ neglected to mention the fact that Dr. Richman's opinion is *not* consistent with

Plaintiff being able to do sedentary work, since he found that Plaintiff could carry no

more than five pounds.  The ALJ also ignored the restrictions imposed by Dr. Richman

including no repetitive lifting of more than five pounds, pushing and pulling no more than

20 pounds and pinching and gripping on a minimal basis.  Further, he ignored the

diagnosis of cervical myelomalacia.  Again, the ALJ was selectively applying

Dr. Richman's assessment to fit his finding that Plaintiff could do a range of sedentary

work while completely discounting restrictions and other impairments imposed by the

treating physician.  Further, he did this without ever considering whether Dr. Richman's

opinions were entitled to controlling weight or stating what actual weight he gave to

each of his findings.

Even if an ALJ decides that a treating physician's opinions are not entitled to

controlling weight, this does not allow him to reject their opinions outright.  *Langley v.

Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004).  Instead, the physician's opinions are

"'still entitled to deference and must be weighed using all of the [relevant] factors.'"  *Id.*

(quotation omitted).[1]  The ALJ did not give proper deference to many of the opinions

___

[1]  These factors are set out in 20 C.F.R. § 404.1527(d).

-7-

and findings of the treating physicians, did not weigh the relevant factors, or consider for the record what lesser weight should be given to their opinions.  The ALJ's failure to apply the correct legal standards or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal. *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

The ALJ also ignored other impairments and findings found to exist by the treating physicians.  For example, on June 16, 2001, Dr. Chan noted that Plaintiff had limited cervical range of motion and only 2/5 strength.  He also noted significant atrophy in the Plaintiff's muscles which were greater on the right side than left side.  (Tr. 146.) On May 2, 2002, Dr. Chan noted that Plaintiff had an injury to his spinal cord resulting in significant chronic C8 radiculopathy with progressive neurological deficit and significant atrophy in both upper extremities.  (*Id.* 135.)  He also opined that Plaintiff's "findings "continue to be chronic in nature." (*Id.* 135-36.)

On October 7, 2002, Plaintiff presented to Dr. Richman with complaints of pain in his neck and upper extremities and right hand numbness.  (Tr. 211.)  Dr. Richman found that Plaintiff had limited range of motion and tenderness in his cervical spine, decreased sensation and reflexes in both hands, and tenderness in the right wrist.  (*Id.* 212).  He diagnosed Plaintiff with cervical myelomalacia with stenosis, probable bilateral chronic C8 radiculopathy, right hand symptoms consistent with carpal tunnel syndrome and neuropathic pain.  (*Id.*)  He also noted significant atrophy of multiple muscles in Plaintiff's upper extremities and the hands.  (*Id.*)

In a form provided by the Colorado Division of Workers' Compensation, Dr. Richman opined that Plaintiff was unable to work from October 7, 2002, until an "indefinite" date. (Tr. 213). In November 2002, Dr. Richman stated his opinion that Plaintiff was unable to work from November 11, 2002 until an "indefinite" date. (*Id.* 210). Both forms noted a number of impairments that the ALJ ignored.

In December 2002, Plaintiff presented to treating physician Dr. Sung, an orthopedic surgeon, for a consultative examination. (Tr. 194-97.) Dr. Sung reviewed Plaintiff's radiographic test results which showed severe spinal cord compression in the cervical spine. (*Id.* 195). He diagnosed C4-7 cervical spondylosis with possible early myelopathy, status post C5-6 discectomy, and recommended a repeat MRI and surgery to release the compression. (*Id.*)

The MRI performed January 22, 2003 showed nerve root impingement at multiple levels of Plaintiff's cervical spine. (Tr. 178.) Also in January 2003, Plaintiff underwent surgery. Dr. Sung, the surgeon, noted in his post-operative report the multiple procedures performed on the cervical spine which included C4-5 anterior cervical diskectomy at C4-7 and anterior cervical arthrodesis and a C4-7 anterior cervical anterior cervical plating along with a C6 corpectomy. (*Id.* 186.) This surgery was more than just a diskectomy, which the ALJ did not properly recognize.

In April 2003, in a workers' compensation form, Dr. Richman stated his opinion that Plaintiff was unable to work from April 9, 2003 until an "indefinite" date. (Tr. 206.) He also diagnosed a number of impairments in that form. (*Id.*)

In August 2003, Dr. Sung reported that Plaintiff continued to exhibit diminished motor strength in both upper extremities which he attributed to the continuing effects of Plaintiff's myelomalacia.  (Tr. 191.)  He also reported that Plaintiff "did not make any significant recovery" after the surgery.  (*Id.*)

From the foregoing, it is apparent that the ALJ failed to properly weigh the treating physicians' opinions and to determine if they are entitled to controlling weight. This error is particularly egregious since I found this same error in connection with the previous decision of the ALJ and remanded with directions to properly weigh the evidence.  (Tr. 379-387.)  I also found error with the ALJ's selective application of the evidence (id.), which again is a problem in connection with the decision at issue.

It is also clear that the ALJ erred in not considering any severe impairments other than degenerative disc disease of the cervical spine and lumber spine.  The record shows that Plaintiff has other diagnosed impairments including significant chronic C8 radiculopathy with progressive neurological deficit and significant atrophy in both upper extremities, cervical myelomalacia with stenosis, right hand symptoms consistent with carpal tunnel syndrome and neuropathic pain, cervical stenosis, bi-later upper extremity neuropathy with muscle atrophy, fasciculation and weakness and chronic back pain, muscle weakness, and an inability to use the upper extremities effectively.  The ALJ ignored this evidence and did not discuss whether these impairments were severe. Again, this error is significant as the ALJ made the same error in the first decision and was specifically advised in my Order of Remand that he must consider all of Plaintiff's impairments.  (Tr. 387-88.)

Since the ALJ did not properly consider all the impairments, his findings at steps two, three and beyond are not supported by substantial evidence. Indeed, Plaintiff argues that his condition satisfies the requirements of Listing 1.04 regarding Disorders of the Spine. The ALJ did not even address this specific Listing, despite the fact that counsel argued at the hearing that Plaintiff met this Listing. (Tr. 529-30.)

I also note that the opinions of the consultative examiners substantiate many of the diagnoses and findings made by the treating physician, and lend support to the existence of additional impairments and limitations beyond those the ALJ found. For example, Dr. Griffis who performed an IME in July 2002 confirmed Plaintiff's myelomalacia, as well as finding a "chronic cervical strain" and radiating right arm pain. (Tr. 155.) He noted that Plaintiff's pain had worsened since the work injury on April 3, 2001. (*Id*)

Dr. Maisel performed a consultative examination in 2004 and diagnosed "[c]hronic neck and upper extremity pain with decreased strength and atrophy of the upper extremities." (Tr. 339-40.) He found, however, that Plaintiff had normal strength and sensation in the lower extremities. (Tr. 339.) Thus, in his letter opinion he restricted Plaintiff's ability to push and pull using his upper extremities to only occasionally.

Instead of relying on the letter opinion which set out in detail the basis of Dr. Maisel's opinions, the ALJ chose to rely on Dr. Maisel's functional assessment check-the- box form wherein he stated that Plaintiff was not limited in the upper extremities but in the lower extremities. (Tr. 11, 343.) Given the fact that this

assessment was inconsistent with the actual examination and findings made by
Dr. Maisel, it was error for the ALJ to find no limitations in the upper extremities.
Further, Dr. Maisel also assessed limited handling (Tr. 341) which the ALJ did not
include in his RFC, even though he purportedly gave "great weight" to Dr. Maisel's
opinions.  (*Id.* 345q.)  Again, the ALJ appears to be selectively applying the evidence to
fit his opinion that Plaintiff is able to perform a range of sedentary work.

Finally, Dr. Velma Campbell found in her consultative examination of Plaintiff on
June 14, 2005 that Plaintiff had loss of muscle bulk in multiple areas of his extremities
and loss of sensation into his forearms and hands.  (Tr. 516-17.)  Further, she noted
Plaintiff's grip strength and strength in deltoids and triceps was reduced to a 3/5 level.
(*Id.*)  She found that Plaintiff's range of motion was painful and noted "hypermobility",
"possibly due to the loss of muscle tone and bulk."  (*Id.*)  Further, she noted muscle
spasms in the neck.   (*Id.*)  Her diagnosis included, among other things, bi-later upper
extremity neuropathy with muscle atrophy, fasciculation and weakness and chronic
back pain.  (*Id.* at 517.)  Indeed, she noted that Plaintiff's condition "was not controlled
for pain and spasm".  (*Id.*)  She also found that Plaintiff "has abnormal neurologic
findings in his upper extremities, consistent with cervical spondylosis, or other spinal
condition."  (*Id.*)  The ALJ stated that he gave "significant weight" to Dr. Campbell's
opinions but, again, ignored the impairments noted by her.

Given the ALJ's selective application of the consultative examiners' findings, their
opinions do not provide a substantial basis for the ALJ's conclusions at steps two and
three.  I also question whether, even if the ALJ had not selectively applied their

opinions, their opinions should have been given significant weight, *i.e,* more weight than the treating physicians' opinions. As Plaintiff notes, Dr. Maisel that he did not even know about the extensive surgery performed by Dr. Sung. Dr. Maisel states instead that Plaintiff "was felt not to be a surgical candidate." (Tr. 337.) As to Dr. Campbell, it appears that she did not review any of Plaintiff's medical records. This means that she had a very limited base of knowledge compared to the treating physicians. Their lack of knowledge as to the severity of Plaintiff's impairments calls into doubt their opinions regarding Plaintiff. The ALJ did not consider these deficiencies. *See Lawton v. Barnhart*, No. 04-1050, 2005 WL 281378, at *9 (Feb. 7, 2005). The ALJ also appeared to ignore the rule that when a "treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Goatcher*, 52 F.3d at 291 (quotations and alterations omitted).

### 2.    Whether the ALJ Erred in Assessing Plaintiff's Credibility

Plaintiff has a long work history. He returned to work after a prior cervical fusion. His return to work was in a physical position as a baggage handler. He has since developed serious medical disorders of the cervical and lumbar spine which include spinal cord injury, atrophy of his muscles in both upper extremities, a fusion of multiple levels of his cervical spine and a herniated disc in his lumbar spine - all pain-generating types of medical disorders.

Nonetheless, the ALJ determined that Plaintiff was "exaggerating" his symptoms and found that while Plaintiff's medical determinable impairments could reasonably be

expected to produce the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 345O.)  Among other things, the ALJ determined there were instances of symptom exaggeration or magnification which would undercut Plaintiff's credibility.  (*Id.*) My Order of March 2006 remanding the case after the ALJ's first decision specifically addressed this issue and found that the ALJ erred in relying on symptom magnification. (Tr. 383-85.)  In his second decision the ALJ completely ignored my analysis of this issue and instead chose to rely on the same findings that I found insufficient.  This is error.

I also note that the ALJ cited to a number of findings that Plaintiff did not put maximum effort into testing.  This is not, however, necessarily equivalent to symptom exaggeration or magnification.  Indeed, treating physician Dr. Chan, whose findings the ALJ cited, stated that the fact Plaintiff did not use maximum effort on one test "should be interpreted with caution", and that Plaintiff *did* use maximum effort on other tests.  (*Id.* 135.)  Further, as noted in this opinion, the treating physicians and other medical providers upon whom the ALJ gave weight all opined that Plaintiff had significant impairments and restrictions as a result of same.  No opinions were given that Plaintiff's credibility was compromised, decreased or that he was less believable because of his reported symptoms.  Indeed, all of the providers routinely diagnosed pain in connection with Plaintiff's impairments.

Even Dr. Maisel, the consultative examiner who noted that Plaintiff had an exaggerated response, went on to diagnose "chronic pain and upper extremity pain with

decreased strength and atrophy of the upper extremities." (Tr. 340.)  Thus, regardless

of his finding of an exaggerated response to "minor palpation" (*id.* 338), Dr. Maisel

found that Plaintiff's pain was credible and assessed limitations in the RFC consistent

with same.  If the ALJ questioned this diagnosis in light of the finding of an exaggerated

response, he should have contacted Dr. Maisel rather than choosing to discount

Dr. Maisel's ultimate conclusions.  In short, it is clear that the ALJ again attempted to

substitute his judgment for that of the medical professionals, which is improper.

*McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)).

The ALJ also found that Plaintiff was not entirely credible because he was using

over-the-counter medications for his pain relief.  Plaintiff testified, however, that he was

not able to obtain his pain medication because his doctor would no longer see him for

follow-up treatment and medication.  (Tr. 539.)  Plaintiff also testified he was taking

Tylenol PM to help him try to sleep.  (*Id.* 546, 551.)  This was not adequately taken into

account by the ALJ.  Further, the medical providers uniformly documented the existence

of chronic pain and the fact that it is not controlled.  (*Id.* 155, 517).  Accordingly, this

finding is also not based on substantial evidence.  *See Carpenter v. Astrue*, 537 F.3d

1264, 1268 (10th Cir. 2008) (the ALJ erred because he "did not link his conclusions to

the evidence or explain how Mrs. Carpenter's repeated attempts to find relief from pain,

and all the drugs she has been prescribed for pain, resulted in a conclusion that she is

unlimited in any regard by pain or the side effects from her pain medication"); *Romero*

*v. Astrue*, 242 Fed. Appx. 536 (10th Cir. 2007) ("Dr. Haddock's conclusions concerning

Ms. Romero's pain and limitation. . . find support in the treatment records and therefore

could not be cursorily dismissed for the reason the ALJ gave: lack of medical evidence.").

Further, there is no evidence that Plaintiff refused treatment.  In fact, he has undergone extensive surgical procedures as recommended by his physicians, steroid injections and physical therapy.  There is no evidence that treatment or taking pain medications would restore his ability to work.  Even when he was on his pain medication – Neurontin – it did not control his pain.  (Tr. 514, report of Dr. Richman Impairment Rating, December 2, 2003).  The record showed that Plaintiff tapered off of Neurontin when it was no longer effective.  (*Id.* 337.)

The ALJ also states there is an inconsistency between Plaintiff's descriptions of his physical abilities and the physicians' determination of his physical abilities.  While there are some inconsistencies, Plaintiff testified and the physicians found that he has significant limitations in standing, walking and sitting and needs to change positions frequently.  The ALJ appeared to parse the testimony on this issue.

Based on the foregoing, the ALJ's conclusion that Plaintiff is not credible is yet again not supported by substantial evidence.

3.    Whether the ALJ Erred at Step Five

Since I have already found that the ALJ erred at steps two and three, the remaining steps of the analysis are also unsupported since the findings at those steps are not based on all of Plaintiff's impairments and limitations.  However, I also find other errors with the step five analysis by the ALJ.   At step five, the ALJ was tasked with determining whether there was other work in significant numbers to which Plaintiff could

return.  The burden of proof rests on the Commissioner at this step.  *Williams v. Bowen,*

844 F.2d 748, 751 (10th Cir. 1988).  Plaintiff is entitled to benefits if the ALJ "cannot

establish that the claimant retains the capacity 'to perform an alternative work activity

and that this specific type of job exists in the national economy.'"  *Id.* (quotation

omitted).

Plaintiff argues first that the ALJ failed to follow the directive of the Court that

SSR 96-9p be considered.  He asserts that in a case such as his where there are

significant manipulative limitations regarding the use of his arms and hands, the ALJ

should have directed a finding of disability pursuant to SSR 96-9p.  I agree that the ALJ

erred on this issue.  The ALJ was specifically ordered to consider SSR 96-9p and its

impact on Plaintiff's ability to work in my Order of Remand.  (Tr. 390-91.)  The ALJ

ignored this directive and did not consider this regulation.

SSR 96-9p provides:

*Manipulative limitations*: Most unskilled sedentary jobs require good use of
both hands and the fingers; *i.e.*, bilateral manual dexterity. Fine movements
of small objects require use of the fingers; *e.g.*, to pick or pinch. Most
unskilled sedentary jobs require good use of the hands and fingers for
repetitive hand-finger actions.

Any *significant* manipulative limitation of an individual's ability to handle and
work with small objects with both hands will result in a significant erosion of
the unskilled sedentary occupational base. For example, example 1 in
section 201.00(h) of appendix 2, describes an individual who has an
impairment that prevents the performance of any sedentary occupations that
require bilateral manual dexterity (*i.e.*, "limits the individual to sedentary jobs
which do not require bilateral manual dexterity"). When the limitation is less
significant, especially if the limitation is in the non-dominant hand, it may be
useful to consult a vocational resource.

*Id.*, 1996 WL 374185, at *8 (July 2, 1996).

This ruling specifies that significant limitations and loss of manipulative ability to work with both hands result in a significant erosion of unskilled sedentary occupations. The ruling also cites an example from 404 C.F.R. Appendix 2.  SSR 96-9p, 1996 WL 374185, at *8.  This example addresses an individual under the age of 45 with no transferable skills with a right hand injury precluding bilateral manual dexterity.  In such a situation, the Social Security Administration acknowledges that the range of work available is significantly compromised and a finding of disability would be necessary. This is similar to Plaintiff's situation, as the record demonstrates that Plaintiff suffers from significant manipulative limitations and other restrictions with regard to both arms. The ALJ did not properly address this issue and its impact on Plaintiff's ability to work.

I also find that the ALJ erred in that he did not consider the fact that during part of the time period from April 3, 2001 through November 27, 2006 Plaintiff's condition varied.  At one point he was put at MMI and given a functional capacity evaluation, then at another point, he was provided additional treatment and underwent invasive surgery in January 2003.  (Tr. 186.)  Significantly, the ALJ erred in that he did not consider the fact that treating physician Dr. Richman placed Plaintiff on **temporary total** disability after his surgery, from October 7, 2002 through November 4, 2003.  (Tr. 206, 210, 213.) It is reasonable to expect that there would be a significant period of time in which Plaintiff would not be released to work given the extensive surgery that he underwent. During this period, which was over 12 months, Plaintiff was unable to perform any employment.  The ALJ did not properly consider this.  Further, the ALJ did not cite any contrary evidence that indicates Plaintiff could work during this period.  Accordingly,

there is not substantial evidence to support the ALJ's conclusion that Plaintiff could work during the period October 7, 2002 through November 4, 2003.

Even after November 4, 2003, Dr. Richman placed permanent work limitations on Plaintiff. These were significant imitations, including no lifting over 5 pounds on a frequent basis and minimal gripping and pinching for both hands. As discussed previously, the ALJ claims he gave significant weight to Dr. Richman's opinion but then did not present Dr. Richman's restrictions, either on a temporary basis after the surgery or on a permanent basis, in the RFC or in a hypothetical question to the VE. There were also other restrictions placed on Plaintiff by the treating physicians and other medical providers which were not included in the RFC, as discussed in Section II.B.1, *supra*. The failure to include all of Plaintiff's limitations and impairments in assessing Plaintiff's ability to work at step five was error.

I also find that there was an inconsistency between the VE's testimony and the Dictionary of Occupational Titles ["DOT"]. While the ALJ notes that the VE stated his testimony was consistent with the DOT (Tr. 345S), the VE gave conflicting statements on this issue. Specifically, as to the Surveillance System Monitor job the VE found Plaintiff could do, the VE acknowledged that the DOT shows this position is limited to monitoring public transportation terminals. (Tr. 558-59.) The VE testified, however, that he was not relying on jobs in such terminals but on surveillance of manufacturing facilities as the basis of this job. (*Id*.) He stated that this was the only Surveillance Systems Monitor position he was aware of. (*Id*.) As this is directly in conflict with the DOT, the ALJ was obligated to

explain the conflict between the VE's testimony and the job description in the DOT. *Carpenter*, 537 F.3d at 1270-71.  His failure to do so constitutes error.

Finally, I agree with Plaintiff that the ALJ's finding that there are a significant numbers of other jobs in the national economy is not supported by substantial evidence. The ALJ's conclusion is based on the testimony of the VE.  The only two positions that Plaintiff could do based on the testimony of the VE were Surveillance System Monitor and Call-Out Operator.  There is evidence, that these positions are, however, not open and/or available to the Plaintiff.

Plaintiff submitted new evidence with his request for review of the second hearing to the Appeals Council.  As part of that new evidence, he submitted a June 20, 2007, report from Michael Fitzgibbons, a Certified Rehabilitation Counselor.  (Supplemental Record ["Supp."], Tr. 610-11.)  In his report , Mr. Fitzgibbons states within a reasonable degree of vocational certainty that the occupation of Surveillance System Monitor does not exist in the State of Colorado as defined in the DOT.  (*Id.*)  He also notes that the type of position the VE testified about in the hearing–monitoring in a manufacturing setting–is usually performed by a security guard.  A security guard position is described as being light and semi-skilled and often requires patrolling by foot or vehicle in responding to emergencies. A security guard position would exceed the abilities of the Plaintiff and would not be considered alternative employment.

The other position identified by the VE at the hearing was a Call-out Operator. Again, the VE testified he was utilizing the DOT code as the basis for his definition of this job.  As defined by the DOT, a Call-out Operator "compiles credit information, such as status of

-20-

credit accounts, personal references and bank accounts to fulfill subscribers' requests, using a telephone, copies information onto forms to update information for credit records on file or for computer input, telephones subscribers to relay requested information or submits data obtained for typewritten report to subscriber."   (Supp. Tr. 612.) Mr. Fitzgibbons states in his report that this position is no longer performed as described in the DOT.  He notes that a more updated vocational descriptive service would use job titles such as a Credit Authorizer, Credit Checker or Credit Clerk.  These occupations require semi-skilled to skilled level of work.  Also, with the use of personal computers and data input, keyboarding requires frequent use of the upper extremities for reaching, handling and fingering.  (Supp. Tr. 612-616.)  Thus, the position would not be a viable alternative position for Plaintiff given his limitations in reaching, fingering, and engaging in fine or gross manipulative activities with his upper extremities.

This new information from Mr. Fitzgibbons as to these two occupations was submitted on behalf of Plaintiff to the Appeals Council.  While the Appeals Council did not directly reference Mr. Fitzgibbons' report, it stated that it considered the ""detailed exceptions" in Plaintiff's letter dated March 7, 2008, as well as the argument that the VE's testimony was inconsistent with the DOT.  (Tr. 345A.)  This report, attached to the letter, and the issues raised in the report were specifically discussed in Plaintiff's letter that was considered by the Appeals Council.  (*Id.* 578.)  Accordingly, I must conclude that the Appeals Council considered this information and it is now part of the record.[2]  It is material

---

[2]   The Commissioner has not disputed the fact that this information was new, material, and chronologically relevant, and I find the information meets this criteria.  "Under 20 C.F.R. §§ 404.970(b) and 416.1470(b), the Appeals Council must consider evidence submitted with a request for review 'if the

evidence which directly contradicts the findings of the VE at the hearing and which supports Plaintiff's argument that the positions are not available and/or are not within the ability of Plaintiff to perform.

Finally, in reference to both of these positions the VE was unable to testify as to the amount of handling that these jobs required, *i.e.*, using ones hands for gripping or pinching (Tr. 561-63.).  Thus, the VE's testimony does not provide a substantial basis to conclude that these jobs are within the ability of the Plaintiff given his RFC.

4.   The Appropriate Remedy

Based on the above errors, I must address whether the case should be reversed for further fact finding or reversed outright with an award of benefits.  I agree with Plaintiff that outright reversal with an award of benefits is appropriate rather than a remand for further fact finding.

First, this case was already remanded in 2006 to the Commissioner with a detailed Order advising of the errors that existed and needed to be remedied upon further fact finding.  Despite this, the ALJ's second decision still failed to properly evaluate and weigh the medical evidence and Plaintiff's impairments.  Indeed, it appears that my detailed Order was simply ignored.  This case has been pending since May 2002, almost nine (9) years. Remanding this case yet again for an ALJ to make another attempt to weigh the evidence seems counterproductive.  The Tenth Circuit has reversed in situations similar to this.  *See*

additional evidence is (a) new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision.'" *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (quotations omitted).  If the evidence meets this criteria and it was considered by the Appeals Council "in connection with the claimant's request for administrative review (regardless of whether review was ultimately denied), it becomes part of the record" that the court assesses in evaluating the Commissioner's denial of benefits under the substantial-evidence standard.  *Id.*

*Sisco v. U.S. Dept. of Health & Human Services*, 10 F.3d 739, 746 (10th Cir. 1993) (the

Commissioner "is not entitled to adjudicate a case *ad infinitum* until he correctly applies the

proper legal standard and gathers evidence to support his conclusion"); *Ragland v. Shalala*,

992 F.2d 1056, 1060 (10th Cir. 1993) ("In light of the Secretary's patent failure to satisfy the

burden of proof at step five, and the long delay that has already occurred as a result of the

Secretary's erroneous disposition of the proceedings, we exercise our discretionary

authority to remand for an immediate award of benefits").[3]

Further, the Tenth Circuit has indicated that "outright reversal and remand for

immediate award of benefits is appropriate when additional fact finding would serve no

useful purpose.'" *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989) (quotations

omitted).  Reversal and remand for immediate award of benefits is appropriate when "the

record fully supports a determination that Plaintiff is disabled as a matter of law and is

entitled to the benefits for which he applied." *Id.*

In this case, the record shows that Plaintiff suffers from many impairments which

significantly limit his ability to do unskilled, sedentary work.  If the treating physicians'

opinions are given controlling weight, it is clear that Plaintiff would be precluded from the

jobs the ALJ found Plaintiff could do and would be disabled.  Further, as discussed

previously, it is doubtful that the opinions of consultative examiners Dr. Maisel and

Dr. Campbell could outweigh the treating physicians' opinion in light of the fact that they

---

[3]  *See also Stephens v. Apfel*, No. 97-6090, 1998 WL 42524, at *3 (10th Cir. 1998) ("This case has dragged on through eight years and three inadequate ALJ decisions.... Under the circumstances, we conclude that an award of benefits is appropriate"); *Havice v. Chater*, No. 96-5074, 1997 WL 8852, at *7 (10th Cir. 1997) ("After three hearings, the Secretary still has not met her burden of showing that the claimant retained the ability to perform a significant number of jobs in the economy....The case is remanded, therefore, for an immediate award of disability benefits").

either did not have Plaintiff's medical records or did not know about Plaintiff's extensive surgery. Even they, however, prescribed impairments and/or restrictions that the ALJ failed to include in the RFC, as previously discussed. If these impairments and limitations were included, again it is doubtful that Plaintiff would not be able to perform the jobs the VE testified to. Finally, the ALJ's decision that work exists in significant numbers is not supported by substantial evidence and there is evidence that supports a finding that Plaintiff could not perform those jobs.

Based on the foregoing, I find that additional fact finding would serve no useful purpose. The record supports a determination that Plaintiff is disabled as a matter of law and is entitled to the benefits for which he applied.

III.   CONCLUSION

In conclusion, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for an immediate award of benefits, rather than a rehearing.

Dated March 4, 2011

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge